IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2019

**WILLIAM PILLARS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Franklin County**
**No. 2012-CR-20449      J. Curtis Smith, Judge**

_____

**No. M2019-00234-CCA-R3-PC**

_____

The Petitioner, William Pillars, filed a petition for post-conviction relief alleging that he received the ineffective assistance of counsel at trial and on appeal. The post-conviction court denied relief, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Roger D. Layne, Chattanooga, Tennessee, for the Appellant, William Pillars.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; James Michael Taylor, District Attorney General; and Steve Blount, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the proof adduced at trial as follows:

> The State's proof at trial showed that the victim, M.C., was 10 years old and in the fourth grade at the time of trial. When the victim was in Kindergarten, she lived in a three-bedroom mobile home with her mother, her infant sister, and her stepfather, the [Petitioner]. The victim recalled that the [Petitioner] engaged in "bad touch[ing]" with her on several

occasions when the victim's mother was not at home. On one such occasion, the victim and the [Petitioner] were on the bed in the master bedroom. The [Petitioner] removed his shirt and pushed his shorts and underwear below his knees, and the victim removed her clothing as well. The [Petitioner] told the victim "that [she] was pretty." The [Petitioner] then touched the victim's chest with "[h]is mouth, his hand and his boy part" and touched her "girl part," which she described as her vagina, with his tongue. The victim drew a picture of the [Petitioner's] "boy part," which was entered into evidence and resembled a penis, and the victim described the [Petitioner's] penis as "bec[oming] hard" and having hair.

The victim testified about another occasion, on which the [Petitioner] rubbed her vagina with both his fingers and his penis "[o]n the inside" of her vagina. The victim stated that it felt "[n]asty" when the [Petitioner] did these things to her.

When the victim was in the second grade, the family moved to a duplex. The victim recalled an occasion in the master bedroom of the duplex when the [Petitioner] again pushed his shorts and underwear below his knees and the victim removed her clothing. The [Petitioner] touched the victim's "chest and [her] girl part" with his "mouth and his tongue, his hand and his boy part." On still another occasion at the duplex, the [Petitioner] told the victim to touch his "boy part" with her hand and her mouth. The victim testified that when she touched the [Petitioner's] penis, "[i]t became hard," and that "[l]iquid came out of it" onto a towel the [Petitioner] had brought to the bed with him.

The victim testified that she never told her mother about the abuse because she feared that her mother "wouldn't do anything about it" because her mother "really never listened to" her. The victim was also afraid to tell her biological father because "it was embarrassing and [she] didn't think [she] should talk to him about this kind of stuff." The victim eventually informed her counselor, Jennifer Loh, about the abuse after the victim's father gained custody of her on July 31, 2012.

On cross-examination, the victim stated that "[n]othing" went inside her body during the episodes of abuse. On redirect examination, the victim clarified that, on the occasions when the [Petitioner] touched his tongue and fingers to her vagina, the [Petitioner] "moved [his tongue and hand] around" and that it felt like the [Petitioner's] hand and penis "[w]ent inside" her vagina.

The victim's father, S.S.C., testified that he and the victim's mother divorced when the victim was less than one year old. In the summer of 2012, the victim's mother "[a]bandoned" the victim and her sister and moved out of the county. S.S.C. learned of this when someone from the victim's school contacted him to pick up the victim. S.S.C. gained custody of the victim at that time and made arrangements for her to speak with a counselor to address any abandonment issues. Following one of the early counseling sessions, S.S.C. had a conversation with Ms. Loh, which resulted in his contacting the Franklin County Sheriff's Department ("FCSD"). Prior to the victim's counseling sessions with Ms. Loh, S.S.C. had been completely unaware of any allegations of sexual abuse.

The victim's mother, N.L.P., divorced S.S.C. in 2004 and married B.L. thereafter, divorcing him in 2007. N.L.P. met the [Petitioner] online in 2007 and married him in 2008. During the time she was married to the [Petitioner], N.L.P. would often leave the victim alone with him while she was at work.

In the summer of 2012, N.L.P. left home to undergo treatment for bipolar disorder. Prior to September of 2012, N.L.P. had no knowledge of the victim's allegations of sexual abuse at the hands of the [Petitioner]. On cross-examination, N.L.P. confirmed that she had obtained a divorce from the [Petitioner] in the summer of 2013.

Jennifer Loh, a private therapist and certified counselor, testified that she began meeting with the victim in August of 2012. Ms. Loh recalled that S.S.C. had arranged the counseling sessions because S.S.C.'s "sister had died and [the

victim] was transit[ion]ing from living with mom to dad." At the end of her second session with the victim, the following exchange occurred:

> [The victim] looked at me and asked if anything she told me would be private, if I had to tell dad, and I explained it to her that if it was something really bad I had to tell dad, and then on the next visit she disclosed being molested by [the Petitioner].

At the beginning of the third session, Ms. Loh brought out dolls to use as play therapy. Using the dolls, the victim reenacted "being at [the Petitioner's] house in his bedroom and the things that [the Petitioner] did to her." Following the session, Ms. Loh met with S.S.C. and disclosed the abuse to him. According to Ms. Loh, "[i]t was very apparent" that S.S.C. was unaware of the abuse until she told him. Ms. Loh then contacted the Department of Children's Services ("DCS"), and S.S.C. contacted the sheriff's department.

FCSD Investigator George Dyer began investigating the allegations of sexual abuse after speaking with S.S.C. He observed the victim's interview with a DCS case worker, and he later spoke with the [Petitioner] over the telephone, advising him that "some allegations had been made" and inviting him to come to the sheriff's department to speak with him. Investigator Dyer did not inform the [Petitioner] of the nature of the allegations.

When the [Petitioner] arrived for his interview at the sheriff's department on September 11, 2012, he brought "some paperwork" with him. Investigator Dyer provided the [Petitioner] with his Miranda warnings, and the [Petitioner] signed a waiver of his rights and agreed to speak with Investigator Dyer. The [Petitioner] then handed the investigator a three-page, typewritten letter, which was entered into evidence and stated, in pertinent part, as follows:

> I never did anything that I saw as molestation. Yes I have seen her naked many

- 4 -

times sense [sic] I knew her. Washed her hair while she was in a bath several times at her mother's request while she didn't feel good. Put lotion on her back after a bath/shower before at her request because she couldn't reach it. She either had her panties or PJs on or a towel on. The last time I seen her with out cloths [sic] was on my birthday because she came to visit. She and [her sister] were in the pool and when she came in she started to freeze due to how cold I keep the place. In my room she stood stiff due to how cold she was. She lifted her arms and asked me to help get the wet stuff off. I pulled her shirt off and she pushed her shorts down half way without bending over and I took them rest of the way and then she put a dry towel around her and I got her dry cloths [sic] and she shut the door and got dressed. . . .

Now yes she has seen me naked also. She has walked in while I was dressing before. She has opened the shower Curtin [sic] while I was in it and saw me washing. Not sure why she did and it was more than once. Nothing I really wanted to speak about because someone might think something like they do now. One time she came in the bathroom while I was showering and looked in at me and I was standing there with my eyes closed masturbating and enjoying the moment. Not sure how long she was standing there but she saw me [ejaculate] and that is when I saw her standing there watching. She shut that Curtin [sic] and left after I saw her. I asked her what did she want after words [sic] and she said she had a question but forgot it. Told her next time holler at me. Didn't want to talk about what she saw because I didn't want to have that conversation. Kept it between us because I didn't want her in trouble for coming in because I always tried to protect her. She had a thing about lotion. She would want to lotion my feet

and legs sometimes after she did her self.  She even told her mom once after she did it because neither of us thought anything of it.  Well at least I didn't.  There was one time she was going up my leg and I think slipped because her hand went strait [sic] up my shorts fast and her hand ended up with my bare privates in her hand for a second.  I was surprised and she acted as if she was but it took her a second before she released it and pulled her hand back.  I figured it was because it caught her off guard so much she froze for a moment.  I slid back in my seat in shock when it happened.  She laughed and said she slipped and asked if I was ok.  I said yes and she went to a foot and ended there.  We didn't talk about it.  I guess we should of [sic].

There was random times she was showing herself to me.  Once on Vine st. [sic] she walked up and lifted her night gown and said her privates were burning and was showing me with her hands down there and holding it open.  I got up and got her some medicine we had for that and asked if her mom showed her how to put it on and said . . . yes and went to the bathroom and did it.  Let's just say she never had a problem being nude around me from the beginning to this year.

. . . . Once in our Belvidere home she was hugging me with her legs wrapped around my waist and I was holding her up.  She started to slide down but I didn't foresee what would happen.  As she slid over my waist my shorts came down.  I felt them moving but could [sic] do anything because I was holding her up.  As she landed on the ground so did my shorts.  Her face was just inches from my penis until I stepped back and pulled them back up.  It was like that for a brief second.  I even told her I was sorry that happened and I couldn't stop it unless

I dropped her on the wood floor. She told me not to worry about it and it was ok and wanted to jump on me again but I didn't. . . .

. . . .

Back with another memory that I forgot all about. I think she was 7 and it was here where I live now, that's what I'm seeing in my mind. We were on the floor wrestling and she was sitting on my chest. Then she moved forward pushing her crotch against my face (yes dressed) and moved a couple of times like a grind before I pushed her off. She just laughed about it. I remembered it bothered me because she did something that she saw or did before I felt. I debated on calling her moms attention to it because it wasn't right. I knew I had no proof and I could be wrong and she could just have thought it was funny and that was all it was. But now I do remember that moment and how unsettling it was.

With this evidence, the State rested. Following a Momon colloquy and the trial court's denial of the [Petitioner's] motion for judgments of acquittal, the [Petitioner] elected to testify.

The [Petitioner] admitted that he had a prior conviction of larceny and an unspecified drug conviction. With respect to his care of the victim during his marriage to N.L.P., the [Petitioner] stated that the victim had asked him to assist her with washing her hair, with which he complied, but the [Petitioner] denied engaging in any sort of inappropriate touching while the victim was bathing. The [Petitioner] also stated that he would assist the victim in applying lotion to her back.

In early September of 2012, N.L.P. informed the [Petitioner] that the victim was accusing him of "molestation." At that point, the [Petitioner] prepared his typewritten letter.

- 7 -

In response to the inquiry of his motivation to write the letter, the [Petitioner] testified as follows:

> I wanted to show that throughout our life and this is five year span. It isn't like what was read in here was like a month of incidents. We're talking a five year span, and I wanted to show that there was no way things that happened in our life could be classified. Now, I never imagined the actual claims were totally different than what I was talking about in here, because they are against me, but I went in there because when I went in there to see the detective I never foresaw this. I never seen anything legally like this. My only thought was I wanted my child, and this is what was stopping me. I didn't see any actual legal type of stuff like this coming from it, because my whole thought was just go in there and try to show him how with [N.L.P.] leaving and the timing and everything, this just happens to come up with the counselor she just met, and just the time alone, I was trying to show them there is no way through our life that this kind of stuff could have happened, which I didn't know what kind of stuff he was talking about.

The [Petitioner] testified that the segment in the letter regarding his "masturbating in the shower" was false, explaining that he had included that part "to know if what [the detective] was going to tell me was going to be true." The [Petitioner] believed that if the detective read the entire letter and responded, "oh, yeah, we know all of this," then the [Petitioner] would know the detective was lying. The [Petitioner] categorically denied engaging in any sexual contact with the victim.

Based on this evidence, the jury convicted the [Petitioner] as charged of three counts of rape of a child and one count of aggravated sexual battery. Following a sentencing hearing, the trial court sentenced the [Petitioner] as a standard offender to a term of 12 years' incarceration for the

aggravated sexual battery conviction and 25 years' incarceration for each of the three child rape convictions, all to be served at 100 percent by operation of law. The court ordered the aggravated sexual battery conviction and the first two child rape convictions to be served consecutively to one another and ordered that the third child rape conviction be served concurrently with the second child rape conviction but consecutively to the other two convictions, for a total effective sentence of 62 years.

State v. William Pillars, No. M2015-01032-CCA-R3-CD, 2016 WL 1398936, at *1-5 (Tenn. Crim. App. at Nashville, Apr. 7, 2016).

The Petitioner appealed his convictions and sentences, and this court affirmed the judgments of the trial court. Id. at *1. Thereafter, the Petitioner filed a petition for post-conviction relief, alleging that his counsel were ineffective at trial and on appeal.

At the post-conviction hearing, the Petitioner's trial counsel, the Public Defender, testified that the Petitioner was charged with three counts of rape of a child and one count of aggravated sexual battery. Initially, co-counsel, an assistant public defender, was appointed to represent the Petitioner. In August 2013, trial counsel joined the representation because co-counsel did not have much trial experience. Trial counsel took the lead during the November 2013 trial. However, co-counsel, who was female, cross-examined the victim because trial counsel did not want the jury to think he was a "grown man . . . attacking a child." Co-counsel also handled the appeal.

Trial counsel said that the defense received "absolute open book discovery." Trial counsel could not recall whether the Petitioner mentioned any witnesses that would help his case but recalled that the Petitioner said the victim's biological father did not like him. Trial counsel said that the trial was a "[s]wearing match" and that the defense was that the victim was lying and that she wanted the Petitioner gone and out of the house.

Trial counsel recalled that prior to trial, the State made an offer for the Petitioner to plead guilty to two counts of aggravated sexual battery with consecutive sentences of eight years on each count for a total effective sentence of sixteen years. The plea offer further provided that for each eight-year sentence, the Petitioner would serve eleven months and twenty-nine days in confinement and the remainder on community corrections or probation. Trial counsel recommended that the Petitioner accept the offer, advising him that if he were convicted at trial, the results could be "devastating." The Petitioner refused to accept the plea offer, saying he was not guilty.

- 9 -

Trial counsel recalled that the Petitioner had criminal convictions from another state and that the State filed a notice of intent to use the convictions to increase punishment and a notice to use the convictions to impeach the Petitioner if he testified at trial. Trial counsel filed a motion in limine to exclude the prior convictions "for being stale, irrelevant and prejudicial." The trial court denied the motion. On direct examination at trial, trial counsel preemptively questioned the Petitioner about the prior convictions because he "didn't want it to look like I was trying to hide anything from [the jury]." Trial counsel agreed that the State had no forensic evidence implicating the Petitioner; therefore, the credibility of the witnesses was important. Trial counsel agreed that the introduction of the Petitioner's prior convictions hurt the Petitioner's credibility with the jury.

At the beginning of trial, trial counsel made an oral motion to exclude Jennifer Loh's testimony about the victim's statements pursuant to the "fresh complaint doctrine." Trial counsel agreed that he thought the fresh complaint doctrine applied to the victim's testimony regarding her statements to Loh about the sexual assault but that he did not object during the victim's testimony because he "did not want to draw attention to it and make it worse." Trial counsel raised the issue of the victim's statements to Loh in a supplemental motion for new trial. Co-counsel raised the issue on direct appeal, and this court held that the issue was waived because no contemporaneous objection was made.

Trial counsel agreed that he filed a motion in limine requesting that the trial court prevent the State from asking the Petitioner about his religion, specifically "about angels and demons." Trial counsel filed the motion pursuant to Rule of Evidence 610, but the trial court denied the motion. During cross-examination of the Petitioner at trial, the State asked if the Petitioner continued to have "sexual urges" after he "found God." Trial counsel did not object to the question "under 610 regarding religious beliefs." Instead, trial counsel objected to the vagueness of the question because the question did not specify "[w]hat type of sexual urges." Trial counsel acknowledged that on direct appeal, counsel's argument regarding the State's questions was based on Rule 610 but that this court "said you can't object one way and then appeal it the other way on the separate ground." Nevertheless, this court determined that the State's references to God and religion were minor and did not prejudice the Petitioner.

Trial counsel agreed that during cross-examination of Investigator George Dyer, he asked how the Petitioner learned about the rape allegations. The State objected to the question on hearsay grounds, and the trial court sustained the objection. On direct appeal, counsel challenged the trial court's sustaining the State's hearsay objection, but this court considered the issue waived because counsel failed to cite to authority.

Trial counsel acknowledged that he took notes of a September 6, 2012 video interview between the victim and DCS worker Ashley Sowder. During that interview, the

victim "said nothing went inside of her." The defense and the State agreed not to show the interview to the jury. At trial, the victim testified that penetration occurred. Trial counsel did not recall why he chose not to put on proof that no penetration occurred, but he said that he thought the video "would have hurt more than it would have helped."

On cross-examination, trial counsel said that prior to trial, he filed a motion to exclude a statement the Petitioner had given to the sheriff's department. The motion was overruled, and the State introduced the statement during Investigator Dyer's testimony. Trial counsel agreed that during cross-examination, he tried to get Investigator Dyer to say that the Petitioner "had talked to another individual and specifically the individual had told [the Petitioner] stuff which led him to write that statement out." However, the State objected, contending that trial counsel was attempting to elicit hearsay from Investigator Dyer. Trial counsel responded that the testimony was not going to be offered for the truth of the matter asserted and, therefore, was not hearsay. The trial court sustained the State's objection. During direct examination, the Petitioner testified about the conversation with the other individual and explained why he wrote the statement. On direct appeal, the defense raised the issue about not being able to question Investigator Dyer regarding the Petitioner's explanation for making the statement, and this court determined that the argument was waived because counsel failed to cite to authority.

Trial counsel agreed that he filed a pretrial motion to prevent the State from "getting a bunch of letters" written by the Petitioner "[t]hat mentioned . . . kind of strange and bizarre discussions of demons and angels and stuff like that." During the motion hearing, trial counsel mentioned Tennessee Rules of Evidence 610 and 403. The State wanted to introduce the letters "with the argument that, in essence, they're inculpatory, this explains his struggle of what he did to this child and how he was struggling with that issue." The trial court ruled that some parts of the letters were admissible. However, the State decided not to introduce the letters at trial. The State "touched on" some of the information in the letters, specifically the Petitioner's sexual urges and his references to finding God. Trial counsel objected to the vagueness of the State's questions regarding "the type of desire or urges," but the trial court overruled the objection. The defense raised the issue on direct appeal. Trial counsel agreed that this court "ruled that [his] objection on vagueness, I guess, was not a proper objection, that it should have been [a] . . . 610, 403 type objection." Regardless, this court "said specifically that those minor references to God and/or religion by the State did not enure to the [Petitioner's] prejudice."

Trial counsel agreed that he filed a pretrial motion to exclude Loh's testimony regarding the statements the victim made to her. The motion was successful, but the trial court cautioned that the door could be opened if the victim's credibility were attacked. During the cross-examination, the defense challenged the victim's credibility, which "opened the door" to Loh's testimony regarding what the victim told her. On direct appeal,

- 11 -

the defense did not challenge Loh's testimony; instead, the defense maintained that the victim "should never have been able to say to the jury that she told somebody about the crime." This court refused to address the issue because the defense did not lodge a contemporaneous objection to the victim's testimony about her statements to Loh.

Trial counsel explained, "I knew we had to attack the [victim's] credibility, the case came down to a swearing match." Trial counsel knew that because they challenged the victim's credibility, the trial court would allow Loh to testify. Trial counsel said, "So frankly, I think I didn't at that moment go into it that much, trying to not make it worse than it was, because I knew Ms. Loh would end up testifying." Trial counsel "guess[ed]" that his pretrial objection "may explain why [he] strategically didn't make a contemporaneous objection." Trial counsel said that he could not think of a "legitimate objection" to the victim's testifying that she had told someone about the incident but that he would have objected if the State had "gone into what was told."

Trial counsel agreed that he filed a pretrial motion to exclude the Petitioner's prior convictions, which the trial court overruled. Trial counsel chose to ask the Petitioner about his prior convictions on direct examination so it would not appear as if the defense were hiding something. The defense appealed the issue, contending that the convictions were too old and not relevant. This court concluded that the trial court erroneously admitted the convictions because it failed to find that the probative value of the convictions substantially outweighed the prejudicial effect but that the error was harmless.

Trial counsel said that he reviewed the discovery and asked the Petitioner his version of events. None of the information led to witnesses other than the Petitioner and the victim because all of the events occurred in private. The Petitioner said that the victim's family did not "like [the Petitioner] and they must have put [the victim] up to it." Trial counsel thought he cross-examined the victim's father about dislike of the victim's calling the Petitioner "daddy."

Trial counsel said that he thought it would have been objectionable if the State had tried to introduce the video interview between the DCS worker and the victim during its case-in-chief. Trial counsel did not think the DCS worker was a "qualified forensic interview[er]." Neither the State nor the defense played the video interview at trial. Trial counsel acknowledged that a child victim's disclosures can often "change along the way."

Trial counsel acknowledged that during cross-examination of the victim, co-counsel asked if the victim had ever walked in while her parents were having sex, and the victim responded that she had not. Co-counsel also asked if the victim had seen anything sexual in a movie or on television, and the victim said no. Trial counsel explained that the defense was attempting to establish alternate ways the victim may have obtained sexual knowledge.

- 12 -

Co-counsel testified that she began working with the Hamilton County Public Defender's Office in 2006 immediately after she passed the bar examination and that she transferred to the Franklin County Public Defender's Office in 2008. In 2012, co-counsel was appointed to represent the Petitioner. She explained that she had represented other clients charged with rape of a child, but those cases had settled prior to trial. The Petitioner's case was her first rape of a child case that proceeded to trial. Co-counsel also represented the Petitioner on direct appeal.

Co-counsel said that during the trial, trial counsel, who was her "boss," was "lead chair." The Petitioner had out-of-state felony drug convictions that were many years old. Prior to trial, the State made several plea offers. The last plea offer included a sentence of split confinement, "two 11/29 served consecutively, and a bunch of years on some type of supervised release." Co-counsel told the Petitioner about the offers and cautioned "that the State was absolutely not going to go away." Co-counsel advised the Petitioner that if the jury believed the victim's testimony at trial, he would be convicted and receive a minimum sentence of twenty-five years.

Co-counsel said that both she and trial counsel reviewed the evidence, including the discovery, spoke with the Petitioner, and had "background checks" done on the victim's family members. Co-counsel also interviewed the victim's mother. Co-counsel denied that she was related to the victim's father's "significant other." Co-counsel said that the State had no forensic evidence implicating the Petitioner. Accordingly, the case would be decided based upon whom the jury believed. The Petitioner told them that the victim's father did not like the Petitioner. The Petitioner also told trial counsel and co-counsel that the victim had watched the movie The Orphan. Counsel looked for evidence that the victim's father's family coerced her into making the accusations against the Petitioner in order to "get rid of him."

Co-counsel stated that the defense was prepared to go to trial. Trial counsel handled most of the motion arguments and the testimony. Co-counsel cross-examined the victim. They pursued the defense of "innocence, that he did not do this. I mean ultimately his defense was that it didn't happen, but this was concocted by the biological family." Co-counsel wrote the appellate brief.

Co-counsel said that on direct appeal, she raised an issue regarding fresh complaint. This court ruled that the issue was waived. Co-counsel "disagree[d] with the fact that the issue was waived as there was a pre-trial motion argued and the court heard that and it was part of the record."

- 13 -

Co-counsel agreed that the defense filed a pretrial motion to prohibit the State from cross-examining the Petitioner regarding his prior convictions. The trial court overruled the motion, and trial counsel asked the Petitioner about the convictions on direct examination. Co-counsel acknowledged that witness credibility was important at trial but maintained that the Petitioner's prior convictions did not hurt the Petitioner's credibility with the jury. Co-counsel explained that the victim's testimony "was very compelling" and that "jurors err on the side of caution when it comes to that kind of charge. If they have a child telling them this has happened they're going to listen to the child."

On cross-examination, co-counsel acknowledged that the State's initial plea offer provided that the Petitioner would plead guilty to rape of a child and would receive a sentence of twenty years. The next offer contained a sentence of split confinement. The Petitioner refused to accept any plea offer that "involved allegations of him sexually assaulting this child." Counsel advised the Petitioner of the seriousness of the charges against him and the potential sentence he could face if convicted at trial. The Petitioner chose to proceed to trial.

Co-counsel recalled exploring the defense that the victim's father disliked the Petitioner and that the victim had been coerced and coached into making the allegations. During co-counsel's cross-examination, she asked the victim if she had seen a movie with a sex scene or if she had inadvertently witnessed her parents engaging in sexual acts, and the victim responded that she had not.

Co-counsel agreed that the case "was kind of a he said/she said situation" and that the defense needed to challenge the victim's credibility. Therefore, the defense "open[ed] the door" to the testimony about the victim's statements to the DCS worker about what happened to her. Co-counsel said that she could not think of anything else she could have done to help defend the Petitioner.

The post-conviction court held that the Petitioner failed to establish that counsel were ineffective at trial or on direct appeal. On appeal, the Petitioner raised the following allegations of ineffective assistance of counsel:

> 1. [Co-c]ounsel waived the issue on appeal of the trial court sustaining the State's hearsay objection to Investigator Dyer's testimony regarding how [the] Petitioner became aware of the sexual abuse allegations.
>
> 2. Counsel failed to make the proper objection to [the] Petitioner being questioned about his religious beliefs.

- 14 -

3. Counsel failed to object to Jennifer Loh's testimony at trial based on the doctrine of fresh complaint and waived the issue on appeal.

4. Counsel allowed evidence of [the] Petitioner's prior convictions into the trial rather than objecting to the State bringing them in during cross-examination.

5. Counsel failed to adequately investigate and present and alternative theory of the case.

6. The cumulative error of all the above mistakes violated [the] Petitioner's right to a fair trial and competent trial.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal

cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). The same test is used to determine the effectiveness of trial counsel and appellate counsel. See Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

This court has previously observed:

> "[F]ailure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter, 126 S.W.3d at 887. Generally, "appellate counsel's professional judgment with regard to which issues will best serve the [Petitioner] on appeal should be given considerable deference[, and this court] should not second-guess such decisions, and every effort must be made to eliminate the distorting effects of hindsight." Id.

Our supreme court has set forth the following "non-exhaustive list" of factors which "is useful in determining whether an attorney on direct appeal performed reasonably competently in a case in which counsel has failed to raise an issue":

> 1) Were the omitted issues "significant and obvious"?
> 2) Was there arguably contrary authority on the omitted issues?

- 16 -

3) Were the omitted issues clearly stronger than those presented?
4) Were the omitted issues objected to at trial?
5) Were the trial court's rulings subject to deference on appeal?
6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7) What was appellate counsel's level of experience and expertise?
8) Did the petitioner and appellate counsel meet and go over possible issues?
9) Is there evidence that counsel reviewed all the facts?
10) Were the omitted issues dealt with in other assignments of error?
11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Id. at 888. "A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful." Michael Fields v. State, No. E2015-01850-CCA-R3-PC, 2016 WL 5543259, at *8 (Tenn. Crim. App. at Knoxville, Sept. 29, 2016) (citing Smith v. Robbins, 528 U.S. 259, 285-86 (2000)).

The Petitioner first complains that co-counsel was ineffective on appeal by waiving the issue of the trial court's allowing hearsay testimony from Investigator Dyer regarding how the Petitioner became aware of the sexual abuse allegations. In his brief, the Petitioner contends that during Investigator Dyer's testimony at trial, the State presented as an exhibit a statement which the Petitioner had typed and given to Investigator Dyer. The Petitioner contended that on cross-examination, trial counsel asked Investigator Dyer whether at the time the Petitioner gave Investigator Dyer the statement, the Petitioner had said that he had "written the statement after speaking with [the victim's mother] on Sunday and when being told about the sex abuse." The State objected on the basis of hearsay, and the trial court sustained the objection. On direct appeal, this court concluded that the issue was waived because of counsel's failure to cite to authorities. The Petitioner now contends that "[r]ather than just simply citing Tennessee Rules of Evidence 801 and 802 arguing that the testimony wasn't coming in to prove the truth of the matter asserted, counsel waived the issue." The Petitioner maintained that counsel's failure deprived the Petitioner of the opportunity to receive a new trial.

The trial transcript reflects that trial counsel asked Investigator Dyer, "And [the

Petitioner] responded to you, did he not, that he, when he gave you this statement, that he had written the statement after speaking with [the victim's mother] on Sunday and when being told about the sex abuse . . . ." The State objected, contending that trial counsel was attempting to elicit self-serving hearsay. Trial counsel responded that the answer would not be hearsay because it would not be used for the truth of the matter asserted but to show "that what he was told caused the effect of him to write this out." The trial court sustained the State's objection, finding that the question would elicit hearsay.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). The post-conviction court found that "trial counsel could not have submitted any convincing authority to counter its ruling at trial that the testimony was not offered for the truth of the matter asserted." Notably, at the post-conviction hearing and on appeal, the Petitioner failed to explain how the trial court's ruling was erroneous. Moreover, we note that at trial, the Petitioner testified that he wrote the statement after the victim's mother told him that the victim alleged the Petitioner had molested her. Accordingly, we can discern no prejudice to the Petitioner. The Petitioner is not entitled to relief in this regard.

The Petitioner next contends that counsel was ineffective by failing to make the proper objection when the State questioned the Petitioner about his religious beliefs. In his brief, the Petitioner contends that at trial, the State asked the Petitioner if he were a "religious man" and "did [he] get [G]od in November of 2012, when you were indicted for this charge, or these charges that we're here now." Trial counsel objected to the questions on the ground of vagueness. On appeal, the Petitioner contends that trial counsel should have argued that evidence of a witness's religious beliefs was inadmissible to show the impairment or enhancement of a witness's credibility under Tennessee Rule of Evidence 610 and that the testimony was more prejudicial than probative under Tennessee Rule of Evidence 403.

The trial transcript reveals that on cross-examination, the following colloquy occurred between the State and the Petitioner:

> Q: Mr. Pillars, are you a religious man?
>
> A: Yes, I am, sir.
>
> Q: Did you get God in November of 2012, when you were indicted for this charge, or these charges that we're here now?
>
> A: No, I did not get God. I stopped running from God.

Q: Stopped running from God. Did you have urges before you accepted God?

A: You'd have to define the word urges.

Q: Sexual urges.

A: I was married and I produced a child.

[Trial Counsel]: Your Honor, I'm objecting. It's still a vague question.

A: Yes.

[Trial Counsel]: He doesn't say what type of sexual urges.

[Prosecutor]: That will be my next question.

[Trial Court]: All right.

Q: Did you have sexual urges that you put away once you got God in November of 2012?

[Trial Counsel]: Again, the same objection, Your Honor. He's not saying what type of sexual urges.

[Prosecutor]: That's the next question.

[Trial Court]: Overruled. Let him ask.

Q: I'm going to ask it one more time. Sir, did you have sexual urges that went away, that you sent away when you got God in November of 2012?

[Trial Counsel]: Your Honor, once again, same objection.

[Prosecutor]: Judge, I'll ask it again. The next question is specific. This is a general question.

[Trial Counsel]: Well, he can't answer the question.

- 19 -

[Trial Court]: I've overruled your objection, Counsel.

Q: Answer the question. I'm not going to ask it again. Surely you've heard it, it's been the third time it's been overruled.

A: Due to the fact that I was set free from my wife and I wasn't having another woman at this moment, yes, sir, because in my belief that is wrong to be lusting after a woman when you're not with a woman in marriage, so, yes, sir.

Tennessee Rule of Evidence 610 provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness's credibility is impaired or enhanced." "[H]owever, Rule 610 should not be read as banning all inquiry into a witness's religious beliefs or opinions." Neil P. Cohen et al., Tennessee Law of Evidence, § 6.10[2] (6th ed. 2011). "The rule only proscribes such proof for the purpose of showing that by reason of their nature the witness's credibility is impaired or enhanced. It does not exclude evidence of a witness's religious beliefs, opinions, or conduct for purposes other than a general attack on or support for the witness's credibility." Id. at § 6.10[4][a].

On direct appeal, counsel argued that the trial court erred by allowing the State to question the Petitioner "'in regards to any matter of a religious nature when they were irrelevant and prejudicial in nature, in violation of Tennessee Rules of Evidence 403 and 610.'" Pillars, No. M2015-01032-CCA-R3-CD, 2016 WL 1398936, at *7. This court noted that counsel had objected at trial on the basis of vagueness and could not assert a different theory on appeal. Id. Nevertheless, this court "determine[d] that these minor references to God and religion did not inure to the [Petitioner's] prejudice." Id. Accordingly, although this court did not directly address the Petitioner's concerns on direct appeal, this court nevertheless determined that the Petitioner suffered no prejudice. The Petitioner has failed to show he is entitled to relief in this regard.

The Petitioner maintains that counsel was ineffective by failing to object to Jennifer Loh's trial testimony based on the doctrine of fresh complaint and by waiving the issue on direct appeal. The Petitioner acknowledges that trial counsel asked the trial court to allow Loh to testify regarding certain statements the victim made to her. The Petitioner also acknowledged that trial counsel stated he did not object to the victim's testimony regarding statements she made to Loh because he did not want to draw attention to the statements and make the situation worse. The Petitioner contends that "[t]his information coming into trial prejudiced [the] Petitioner's right to a fair trial as well as falling below the standards required of counsel. The same is also true regarding [the] Petitioner's appeal."

On direct appeal, this court noted:

> The fresh complaint doctrine permits the *fact*, but not the *details*, of a complaint of rape in the case of an adult victim to be admitted during the State's case-in-chief. State v. Kendricks, 891 S.W.2d 597, 603 (Tenn. 1994). In child rape cases, however, neither the fact nor the details of the complaint may be admitted in the State's case-in-chief, unless admissible under a hearsay exception or to corroborate a prior consistent statement. State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995).

Pillars, No. M2015-01032-CCA-R3-CD, 2016 WL 1398936, at *7.

Turning to the Petitioner's complaint that trial counsel failed to object to Loh's testimony regarding the victim's disclosure about the abuse, we note that the Petitioner acknowledges that trial counsel filed a motion in limine to exclude Loh's testimony on the matter. The trial court ruled that the testimony was inadmissible unless the defense opened the door. Because the defense wanted to call the victim's credibility into question, counsel deliberately allowed Loh's testimony. On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). The Petitioner has failed to show he is entitled to relief in this regard.

The Petitioner also contends that counsel should have objected to the victim's testimony that she made a complaint to Loh. Generally, a "child victim's testimony that she made a complaint to a third party . . . is a fresh complaint and should have been excluded under Livingston." State v. William Terrell Hampton, No. E2000-00582-CCA-R3-CD, 2000 WL 1801859, at *4 (Tenn. Crim. App. at Knoxville, Dec. 8, 2000). However, trial counsel testified that he did not object to the victim's testimony because he did not want to draw the jury's attention to the testimony and make the situation worse. Once again, this is a tactical decision that will not provide a basis for post-conviction relief. Taylor, 814 S.W.2d at 378.

The Petitioner asserts that trial counsel was ineffective by introducing evidence of the Petitioner's prior convictions at trial rather than objecting to the State's to address them during cross-examination. One of the convictions was a 1989 larceny conviction, and the

- 21 -

other was a 2003 felony drug possession conviction. Trial counsel testified that he asked the Petitioner about the convictions because he did not want the jury to think he was hiding something from them. The Petitioner notes that on direct appeal, this court ruled that "the trial court erred by admitting these prior convictions." The Petitioner maintains that "[t]his information coming into trial prejudiced [the] Petitioner's right to a fair trial as well as falling below the standards required of counsel. The same is also true regarding [the] Petitioner's appeal."

We note that trial counsel's decision to question the Petitioner about the prior convictions on direct examination instead of waiting for the State to cross-examine the Petitioner about the convictions was a reasonable tactical decision. See Ronald Bradford Waller v. State, No. E1999-02034-CCA-R3-PC, 2000 WL 982103, at *24 (Tenn. Crim. App. at Knoxville, July 18, 2000). As we stated earlier, we will not second-guess a tactical decision on appeal.

The Petitioner contends that counsel were ineffective by failing to adequately investigate and present an alternative theory of the case. The Petitioner asserts that he "maintained throughout the underlying criminal case that the allegations were a product of the [victim's father's] family disliking the [Petitioner]. This was not investigated by the Petitioner's attorneys nor was it brought out at trial to show bias."

At the post-conviction hearing, counsel testified that they investigated the Petitioner's case and explored the idea that the victim was coached into making the allegations because her father did not like the Petitioner. The Petitioner did not present any witnesses at the post-conviction hearing to testify regarding what further investigation would have uncovered. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate regarding the benefit any additional alleged proof might have offered to the Petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

Finally, the Petitioner contends that the cumulative errors violated his right to a fair and competent trial. Having found no cumulative errors, we conclude that the Petitioner is not entitled to relief in this regard.

### III.  Conclusion

Upon review, we affirm the judgment of the post-conviction court.


          _____

          NORMA MCGEE OGLE, JUDGE